[Civ. No. 3541. Third Appellate District.—August 7, 1928.]

ROBERT B. STACY–JUDD, Respondent, v. ANNA VERONICA STACY–JUDD, Appellant.

Duke Stone for Appellant.

Jerome H. Kann for Respondent.

HART, J.—The plaintiff and the defendant are husband and wife. This is a suit by the plaintiff for a divorce from the defendant on the ground of wilful desertion. The complaint, which was filed on the tenth day of September, 1924, after alleging the fact of the intermarriage of the parties in January, 1917, and the fact of the plaintiff's residence in the state of California and of the county of Los Angeles for more than one year prior to the commencement of this action, proceeds:

"The said plaintiff further alleges that on or about the 19th day of September, 1921, in the City of Calgary, in the Province of Alberta, Canada, the said defendant, without cause or provocation on the part of this plaintiff and against his will and without his consent wilfully left and

separated herself from said plaintiff with the intent to desert the said plaintiff and that the said defendant ever since the said date has lived and still continues to live separate and apart from the said plaintiff against his wish and without his consent.''

The complaint further states that "there is no issue of the said plaintiff and said defendant," nor (it is likewise further stated) are there "any community or other property rights between the said plaintiff and the said defendant.''

A general demurrer to the complaint was overruled, and the defendant thereupon answered, denying the essential allegations of the complaint and then declaring:

"That it is true that plaintiff and defendant have been living separate and apart for some time but defendant alleges that such separation was not caused by any act or wish of the defendant herein and that such separation was contrary to and against the will and consent and wish of this defendant and the same has been caused and continued on account of the conduct of the plaintiff towards the defendant, and not otherwise. This defendant further alleges that she never at any time deserted or abandoned the said plaintiff or separated herself from him, either without his consent, or otherwise, or at all, and that she has only lived separate and apart from the said plaintiff because of his refusal to live with or support this defendant.''

The statement in the complaint that there is no issue of said marriage and the further statement that there are no community or other property rights of the parties are not denied, and the truth of those allegations of the complaint, therefore, stand admitted by the pleadings. And there is no evidence in the record of children born to them or of any community rights between the parties.

The court made findings, upon which it predicated its interlocutory decree, declaring that the plaintiff is entitled to a divorce from the defendant. The latter appeals from said decree.

The points urged here are that the findings and the interlocutory decree are without sufficient evidentiary support, but that if there was a voluntary separation by the defendant from the plaintiff with intent to desert the latter, the evidence shows that the former, before the expiration

of the statutory period (one year) required to constitute a cause of action for desertion, offered in good faith to fulfill the marriage contract, and solicited condonation, which was refused by the plaintiff. (Civ. Code, sec. 102.)

The findings and the decree are afforded sufficient evidentiary support. It may be conceded for the purposes of this decision that upon the ultimate questions of fact there is a substantial conflict.

The plaintiff is an architect by profession and the defendant a school teacher. They intermarried on the tenth day of January, 1917, at the city of Minneapolis, in the state of Minnesota. At that time the plaintiff resided at Minot, North Dakota. Plaintiff testifies that after his marriage with defendant he made up his mind to leave Minot and seek a location elsewhere; that, carrying out this determination, he went to Calgary, Canada, in January, 1920, and, after being there "a week or two," decided to locate at that place, and did take up his residence there. He continued:

"I decided to stay in Canada and I established a home there and later went back to Minot, packed up various goods and we drove back to Calgary June, 1920. About three weeks after she arrived she told me she had made a contract with the school board in Minot, North Dakota, to return there for the winter season and I objected to that but I allowed her to go and she went for the September opening of school and left me for three and one-half or four months. Then I wrote her urging her to return, which I think she did, just before Christmas. When Mrs. Judd came in June I had been living in a flat. I did not have my own home and had not established a home there because my furniture was still in Minot and my home was really in Minot, North Dakota. I bought a house in Canada in April, 1921, after Mrs. Judd returned from North Dakota from her school. We lived together until the 19th of September, 1921, about a year, I think. She and her mother left for Minnesota the 19th of September, 1921, and I consented for her to go, no question about that. I took them to the train. I gave her One Hundred Dollars ($100.00) for her expenses. . . . The train left at 11:15. I drove them down to the station in my automobile. I left Calgary, Canada, I think, in September, 1922, a little over a year

after she left. I came down to this coast and drove back again and decided Los Angeles was the best place and I just got out of Canada in September, 1922. After September 19, 1921, I wrote to my wife many times. I received other letters which I have not produced in court. I could not state how many. I received the fourteen written and printed cards and the letters evidenced by the registered receipt. The next time I saw my wife after September, 1921, I think was the Fall of 1923, probably it was 1924. In the meantime I sued for divorce in North Dakota on the ground of desertion, based on the separation of September 19, 1921. I went to my lawyer in Calgary and he advised me to bring the action in North Dakota, which I did. He said that the action would be better there because at the time I had no intention of leaving Calgary and it would have done my business no good anyhow, and when I journeyed down to Fargo, North Dakota, I was notified by my attorneys that Mrs. Stacy-Judd, my wife, had decided to put in an answer and my attorneys advised me to take the case out of the court there and wait until I came to California and stay there a year and start over again.''

Plaintiff further testified that he did not know that his wife was going to Minneapolis with her mother on the 19th of September, 1921, until within a few hours of the time they departed. Defendant then stated to the plaintiff that she intended to take her mother home and would remain at Minneapolis for two or three weeks and then return to Calgary. ''After that time elapsed,'' continued plaintiff, ''I began to wonder whether she was coming back or not, because on her departure I noticed a great many items taken out of the house''—that is, as he explained, ''all the silverware, a lot of china, glass, bed linen; in fact, there was practically nothing left but the furniture itself—no other items. But, as she had left the previous year for a period of four months, I thought probably I might induce her to come back; so I wrote at various times to Mrs. Stacy-Judd, urging her to return. Q. What did she reply? A. I don't remember having a reply at all. And then about a month or five weeks before Christmas I thought I would make a final effort, and I redecorated the house, spent quite a lot of time there, and got together a lot of items; and at

that time I also had my mother, and I sent her a long telegram urging her to return; that was just prior to Christmas; and I did not get an answer at all until, I think the letter was dated the 10th of January, 1922, wherein she said she had no intention— Q. Just a minute. Was there any particular argument prior to the time she left as you stated? A. No, sir, none at all. Q. I show you a letter purporting to be dated January 10, 1922, signed 'Anna' and ask you to look at the signature and letter and state in whose handwriting both are? A. Mrs. Stacy-Judd's. Q. Is this the letter you received by ordinary course of mail? A. Yes, sir.'' The letter referred to, with a few statements contained therein, as given here, deleted because not being of importance, reads:

> "Minneapolis, Minn.
> "3701 Park Ave.,
> "Jan. 10–22.

"Dear Robin:

"Your letter and telegram rec'd and it is hard to answer them. In the first place let me state that I too am troubled with my heart caused from worry and trouble during my married life and trying to summon up the courage and strength to return to my unhappily married life.

"When I left Calgary for my visit here, I felt crushed and heart-broken, but thought that time and a complete change would give me enough strength to make one more trial, but I find that I have not the vitality to face it all again. I'm trying not to hold it against you Robin, for it may be natural for you to be selfish and to possess an ungovernable temper along with other faults. You have made many promises but am sorry to say you have failed to keep them. You may think you care for me, but back of it all is Self. No, Robin, you ceased to care for me shortly after our marriage. Even on our honeymoon you didn't consider my wishes. I can never remember your doing one thing just to please me alone, there was always a selfish motive lurking near. . . .

"You often threw it up to me that I didn't have the nerve to leave you and I said unless you changed your ways I would be obliged to prove to you that I had. You told me last winter that you lost 'all interest' in me, and you cer-

tainly proved it many times. Right up to the last minute we were in Calgary you were so unkind and selfish. You didn't get on the train or even wait until it pulled out. I'm trying hard to forgive all this but I can never forget!!

"I won't go into the details any longer, but let it suffice to say that it is all for the best that we should part. Life is short the longest. So you have my permission to get a divorce, marry again and start life anew. As for me, I have no intention to even marry again for it is indeed far too risky. All I want is peace and contentment. No one to bawl me out publicly—swear at me—keep me up all hours and bore me all evening, etc.

"I have taken a long time in which to make my decision and this is final. My folks refuse to have anything to say on the subject.

"*Robin please do not try to see me as it will do no good, for you have killed all my love for you. You can get your divorce on desertion if you wish one.*

"When you stop to think it over you are better off than I am to begin life over again. You never worry for any length of time and then you have our little home—the furniture and the car, while I have gone out into the world as any servant would, with just my few belongings. . . . "

On February 19, 1923, the defendant wrote and addressed the following letter to plaintiff:

"Minneapolis
"625 E. 32nd St.,
"Feb. 19, 23.

"Dear Robin:—

"I rece'd a letter from Mr. Shure telling me that the case was dismissed in N. D. Will you please tell me if you intend starting one again in Cal. as soon as your domicile is established there. Also tell me if you paid the taxes on that piece of land up to date.

"Sincerely,
"ANNA."

(The "piece of land" spoken of in said letter consisted of about an acre of land in North Dakota which plaintiff, before the separation of the couple, had conveyed to defendant by a deed of gift.)

The defendant, not having received an answer to the above letter, addressed the following letter (undated but registered at Minneapolis) to plaintiff:

"Minneapolis
"625 E. 32nd St.

"Dear Robin:—

"Two weeks ago I wrote asking you two questions, and as you haven't answered them I thought perhaps either you were ill or it never reached you, as I put no return on it. I would not be able to tell if you rec'd it. So I thought it best to write again and this time register it.

"I asked you if you had paid the taxes on that small piece of land for this year, and if not I'll pay it. I didn't want to ask them at Minot about it. Then the other question was if you are going to start another case in Cal. as soon as it is possible. This last I want to know very much, Robin, so please be rather nice to me and answer my questions, and I may help you to obtain what you wish so much for.

"I hope your health is alright now.

"Sincerely,
"ANNA."

Again the defendant addressed a letter to plaintiff, at Minneapolis, under date of August 29, 1923, which is as follows:

"Minneapolis, Minn.
"625 E. 32nd St.,
"Aug. 29, 23.

"Dear Robin:

"You said in your letter that you held no rancour nor bitterness toward me and yet when I was kind enough to inquire if you or your mother were injured in that earthquake shock you never answered nor allowed your mother to do so. For I'm sure she would have been polite enough to have written at least one line.

"Robin, please play the game like a good sportsman and tell me if you have started the case there in Los Angeles, and if so about what time I'll be served.

"Come on, Robin, just for old time's sake answer this.

"Sincerely,
"ANNA."

The above letters, it will be noted, were written subsequent to the expiration of the one-year period during which wilful desertion must exist before it becomes a legal ground for divorce. The plaintiff testified that in no letter received by him from the defendant was there any proposal or suggestion of reconciliation or an offer to return. It appears that the defendant went to Los Angeles in October, 1923, "to see," so she testified, "if I could make up with him," but found that he would not talk to her on the subject of reconciliation. This, it will be observed, was two years after the date (September 19, 1921) she left Calgary for Minneapolis with her mother, and, obviously, only a few months short of two years after defendant's letter to plaintiff under date of January 10, 1922, was written, in which she positively declared that she had decided not to return to and live with the plaintiff, and that such decision was final. The plaintiff testified, however, that, after her arrival in Los Angeles, the defendant had a number of conversations with him, either in person or over the telephone, and that in none did she express a desire for a reconciliation, but on every such occasion discussed the matter of a money settlement only.

Richard Roberts testified: "I met the defendant at the Hollywood Branch of the Pacific Southwest Bank, where I was manager at the time. Mrs. Judd came to the office and stated she had left Mr. Judd in North Dakota on account of his inability to support her and she was down trying to arrange a monetary settlement with him. She said she had not been happy with him. This was in the Spring of 1925."

Mrs. Hallie Hayward, residing in Los Angeles, and an acquaintance of the defendant, testified that the latter was at the witness' home a short time after the complaint herein was filed (Sept. 10, 1924); that during the course of the conversation the defendant stated she "had come out to California, I think it was in the summer previous"; that some friends had written her before she went to Los Angeles and "told her that her husband was doing a very good business, and she said that she had given the better part of her life to him and she felt that some recompense was owing to her, and she had made up her mind that if he was getting along he ought to support her"; that she further said

that "she had been unable to live with him because she had come from a home where she had everything, every luxury, and when she married Judd she was under the impression that he was a wealthy young bachelor, and after she married him she found out that he hadn't any money; that she had not been accustomed to do housework, and she didn't like it, and she said that in order to not to go around in rags she had to teach school." The witness, continuing, stated that defendant further said that "she preferred teaching school to keeping house, and disliked living with him so much that she would rather be occupied." She (defendant) in that conversation also declared that her · family disliked Judd.

Mrs. Ann Stevens, who was present at the conversation between the defendant and Hayward, upon being asked by counsel for the plaintiff as to the purport of said conversation, testified:

"Well she (defendant) merely said that she heard Mr. Judd was doing well out here, and she came out here to get a money judgment, but she would not live with him, and when she went back to her mother she went with the expectation of never returning; she always lived in luxury and she thought when she married him he was a man of wealth and after she married him she found out he was poor and he could not give her the things she wanted and so she went out to teaching school, which she preferred to housekeeping, and her mother was well to do, and she knew she had a good home to go to."

Herman Vanderhoogan, a building contractor, was acquainted with the plaintiff in Calgary, Canada, and had met the defendant there in her husband's office. The witness had done some work on plaintiff's house in Calgary. He (the witness) went to Los Angeles in 1922, arriving there on November 10th of that year. He testified that in the year 1924 he met the defendant in the plaintiff's office in Hollywood. In 1925 he met her in the Pacific Southwest Bank in Hollywood; that he was in the lobby of the bank waiting for a party with whom he had an engagement, and the defendant, being also in the lobby of the bank at that time, "noticed me, and walked up to me and started talking about what she had previously told me in the (plaintiff's) office. She said she was absolutely dissatisfied with Mr. Stacy-Judd

and she could not get what she wanted; she wanted a settlement in good, real hard cash, and she could not get any money out of him, could not get any care, and he had never kept her; it was absolutely—he was absolutely no good, and she could not live with him."' Vanderhoogan also corroborated the testimony of the plaintiff to the effect that, prior to the latter's receipt of defendant's letter of the tenth day of January, 1922, he was having his house in Calgary remodeled and repaired so that it would be in good condition on the return of the defendant to Calgary.

The foregoing statement of the evidence presented by the plaintiff is sufficient to confirm the statement above made that the findings and the decree are amply supported.

The defendant testified that she endeavored in every way to effect a reconciliation between her husband and herself, but that he refused to entertain any proposition looking to that result. She said that the letter written by her to the plaintiff under date of January 10, 1922, was intended as a "bluff," her motive being the hope that thus she would bring him to his "senses" and cause him to resume their marital relations and live happily together. She then, rather inconsistently with that statement, testified that she did not intend to mail the letter, but that while she was temporarily absent from home or the room in which she had left the letter, her sister mailed it with other letters. But there was introduced in evidence no letter written and sent by the defendant to the plaintiff in which she expressed a willingness to return, or a desire or wish that their differences be forgotten and thus their reconciliation effected. There were, it is true, several postoffice receipts of registered letters sent by the defendant to plaintiff, but the letters themselves were not produced. Besides, with the exception of one or two of these, said letters were sent to and received by the plaintiff after the expiration of one year from the time that the defendant deserted the plaintiff. The defendant testified that the registered letters contained, substantially, an acknowledgment by her of her error in leaving the plaintiff and a direct offer on her part to return to and live with him. But, as seen, the defendant contradicted her testimony as to that matter, hence, as to any of the registered letters sent by defendant to the plaintiff prior to the expiration of the statutory period for desertion which de-

fendant claims contained an offer by her to return to and resume marital relations with the plaintiff, there is a substantial conflict in the evidence, which it was the sole function of the trial court to settle. Section 102 of the Civil Code reads as follows:

"If one party deserts the other, and before the expiration of the statutory period required to make the desertion a cause of divorce, returns and offers in good faith to fulfill the marriage contract, and solicits condonation, the desertion is cured. If the other party refuse such offer and condonation, the refusal shall be deemed and treated as desertion by such party from the time of refusal."

As the counsel for the plaintiff well says in his brief:

"In order that a desertion may be cured it is essential under said section, first, that the return of the guilty spouse be made prior to the expiration of the statutory period of one year; second, that the offending party return; third, that the guilty party offer in good faith to fulfill the marriage contract and, fourth, that the guilty party solicit condonation."

█ It is settled law that repentance on the part of the offending party cannot have the effect of destroying a cause of action for desertion already accrued, unless the injured party of his own free will accept such offer of condonation. Of course, this means that the injured spouse is not compelled to accept an offer to return made after the expiration of the statutory period in such cases.

In *Walker* v. *Walker,* 14 Cal. App. 487 [112 Pac. 479], it is said:

"In *Benkert* v. *Benkert,* 32 Cal. 468, the wife had manifested no intention to return to her husband until after the statutory period constituting desertion had elapsed. The court said: 'Her repentance did not obliterate the offense. If it had been accepted and acted on by the plaintiff, by receiving her and renewing the cohabitation, it would be regarded as a condonation. But he may, after the lapse of the statutory period, refuse to accept the offer. Bishop (sec. 530), in speaking of the offer to return, says that if it is made in good faith within the period prescribed by the statute to complete the offense, it will bar the suit. But after the time has expired and the right of action has fully accrued, the injured party is not obliged to accept such

an offer; it comes too late.' " (See, also, *Kenniston* v. *Kenniston*, 6 Cal. App. 657 [92 Pac. 1037].)

Respecting the element of good faith as one of the essentials of an offer of the guilty party to return, it is said in *Peretti* v. *Peretti*, 165 Cal. 717, 719 [134 Pac. 322 323]:

"But while the law, where one spouse deserts the other permits the delinquent spouse to repent and seek reconciliation and restoration and if refused makes it thereafter desertion on the part of the otherwise innocent spouse, the offer of the spouse originally at fault to resume conjugal relations must be made in good faith. *Whether good faith exists in making such an offer is a question of fact, and the determination of that question by the trial court will not be disturbed if there is any ground for supporting it."*

In *Kusel* v. *Kusel*, 147 Cal. 52, 54 [81 Pac. 297], it is said that under the terms of section 102 of the Civil Code, to cure desertion, it is necessary that, with the offer to fulfill the marriage contract, condonation must be asked for or solicited.

The plaintiff, it appears, upon receiving from defendant the letter of January 10, 1922, delivered it into the hands of an attorney, with directions to the lawyer to prepare and file a complaint in a suit for divorce against the defendant. It is here contended by the defendant that those acts on the part of the plaintiff constituted a refusal by the latter to accept the defendant's offer for reconciliation. But this contention is inconsistent with the trial court's sufficiently supported findings. In other words, the contention proceeds upon the assumption of a return and offer by the defendant to renew marital relations, which elements, according to the findings, supported as we have said by the evidence, are absent from this case.

Another contention by the defendant is that the evidence shows that the separation was by or upon mutual agreement of the parties. Of course, the findings are also inconsistent with that contention. While it is true that the plaintiff, after learning (only a few hours before the hour of their departure) that the defendant and her mother intended to leave Calgary for Minneapolis acquiesced in the defendant's plan to make that journey, still it is clear that the evidence, viewed as a whole and upon a rational consideration thereof, warranted the court in finding, as in

legal effect it did find, that the defendant, when she left Calgary for Minneapolis, did so with the deliberate intention or purpose to separate permanently from the plaintiff and so desert him. Plaintiff's approval of her act in departing from Calgary at the time mentioned was, according to his testimony, which the trial court had the legal right to accept, upon her representation to him that she merely desired to accompany her mother to her (the mother's) home in the American city named, and that she (defendant) would return to the plaintiff at their Calgary home in two or three weeks. Moreover, as seen, the plaintiff testified that, unbeknown to him, the defendant (who had undoubtedly been contemplating that journey to Minneapolis for some time prior to her departure therefor) had gathered together and packed in a form convenient for shipment, or carriage in some manner, nearly, if not quite, all the household equipments contained in the Calgary house of the parties, and shipped or carried them with her to her mother's Minneapolis home. These circumstances, together with the fact that she did not return to plaintiff, but instead of so doing wrote and sent him her letter of January 10, 1922, in which she declared that her decision not to return to or live with the plaintiff was final and that (in effect) any appeal he might make to her for a resumption of the marital relation between them would be futile, constitute a singularly strong showing of her intention to desert the plaintiff, an intention of which the latter, so he testified, had no knowledge or suspicion until it was revealed to him by the defendant's said letter to him. Thus it was further shown to the evident satisfaction of the trial court, that the plaintiff did not acquiesce in or agree to or approve the act of the defendant in separating from him in the sense of a separation which, if existing for the period of one year, would give to the innocent spouse a cause of action for divorce on the ground of wilful desertion.

There are no further points requiring consideration. There is no substantial merit in the appeal. The decree appealed from is, accordingly, affirmed.

Finch, P. J., concurred.